IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| TRANE US INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:17-cv-00042(MTT) |
| | ) |
| YEAROUT SERVICE, LLC, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## ORDER

Defendant GSC and Defendant Allied World f/k/a Darwin move for summary judgment on Defendant Yearout's claims against GSC and Allied World for GSC's alleged breach of contract. For the following reasons, that motion (Doc. 83) is **DENIED**.

## I. BACKGROUND

This case arises from a consolidation of two cases, both involving a renovation project of Hangar Dock Building 54 at Robins Air Force Base in Warner Robins, GA ("the Project"). Docs. 20; 29. The United States Army Corps of Engineers was the owner of the Project, GSC was the general contractor, and Defendant Yearout subcontracted with GSC to perform "complete mechanical and plumbing work in accordance with the RFP [Request for Proposal]." Doc. 20-1 at 1, 12. The "RFP," or Request for Proposal, is a comprehensive document detailing the work to be performed on the Project as part of the prime contract between GSC and the Corps of Engineers. *See* Doc. 88 at 211:1-13, 110-139. The RFP notes that "[t]hese specifications and drawings are at a 40 – 60% development stage." Doc. 88 at 115.

The subcontract included a base bid award of $380,390. Doc. 20-1 at 12. It also noted that an option "to include remaining mechanical/plumbing work in contract may be forthcoming." *Id.* It further specified that once that option was awarded to GSC, Yearout would "accept option at a cost increase of $3,436,009 to complete turnkey mechanical and plumbing system." *Id.* The subcontract was dated February 3, 2015. Doc. 20-1 at 3.[1] The option was later accepted. Doc. 88 at 213:2-25. The subcontract contemplated Yearout purchasing "stacked internally supported MAU's and humidifiers" from Trane for a negotiated price of $1,645,000. Doc. 20-1 at 12. At the time the subcontract was signed, however, the design and placement of the MAUs were subject to change. *See* Doc. 90 at 138:14-16. In the original design, the upper MAUs were on a raised platform, but the design later changed so that they were stacked on top of the lower ones, without the intervening platform. Doc. 87 at 166:2-20. The MAUs would require occasional maintenance and service, necessitating a catwalk to access them. *See* Doc. 94 at 45:14-52:18. During May 2015 and June 2015, there were ongoing discussions about how to design the MAUs, catwalks, and roof systems. Doc. 94 at 65:23-70:4, 111:18-112:20.

In June and July of 2015, GSC received bids for structural work, including a catwalk, from a company called Steel Fab. Doc. 91 at 36:5-37:18, 57. The final bid by Steel Fab was for $359,468. *Id.* A contract to provide catwalks—whether to remedy Yearout's failure to provide catwalks or as a subcontract on a different scope of work is disputed—somehow ended up going to a company called CDM on July 21, 2015, for $2,189,000. Doc. 93 at 21:22-23:16. CDM then subcontracted the same scope of work

---

[1] The contract was signed by the parties on March 3, 2015 and March 10, 2015, though it notes the date of the Agreement is the one "first written above" in the contract. Doc. 20-1 at 17. That date is February 3, 2015. *Id.* at 2-3.

to Steel Fab for the amount of its original bid to GSC, $359,468.  *Id.* at 25:5-27:16, 30; Doc. 91 at 51.  The difference between the $2,189,000 and the $359,468 was apparently compensation for the idea of stacking the MAUs, which was CDM's idea.  Doc. 93 at 17:4-18:20, 27:2-16.[2]  McKnight, GSC's owner and president, testified that everyone agreed to this solution.  Doc. 88 at 8:25-9:3, 133:23-134:19.

Yearout sued Allied World under the Miller Act to recover on the payment bond for GSC's alleged failure to pay Yearout for its work under the subcontract.  *Yearout*, 5:16-cv-568, Doc. 1 at 3-5.  Yearout cross-claimed against GSC for breach of contract, arguing that the cost of the MAUs increased due to design changes and that GSC never issued change orders, as it allegedly promised it would, to compensate Yearout for the added cost.  Docs. 90 at 143:7-12; 28 at 7-10.  Yearout also claims it incurred costs due to delays attributable to GSC.  Doc. 28 at 10.  GSC also cross-claimed against Yearout for breach of contract, including abandonment of the Project, failure to properly install the MAUs, and cost increases for GSC relating to ductwork structural support and demolition.  Doc. 18 at 11-12.

GSC and Allied World now jointly move for summary judgment on Yearout's claims against them, arguing that Yearout materially breached its contract and is thereby barred from recovering against GSC or Allied World for their alleged breach of contract.  Doc. 83-1 at 2; *Yearout*, 5:16-cv-568, Doc. 6 at 6.

---

[2] CDM was jointly owned by Locke McKnight, GSC's owner and president, and his wife, Heather.  Docs. 93 at 21:22-27:16; 88 at 8:25-9:3, 125:9-17, 132:15-133:16.  The idea to stack the MAUs was Heather's.  Docs. 93 at 17:4-18:20, 27:2-16; 88 at 133:5-14.  No one contends this apparent windfall has anything to do with the issues raised by the motions, but Yearout goes to some length to call attention to it.  Understandably.

## II. DISCUSSION

### A. Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56€, the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56€(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

**B. Analysis**

GSC and Allied World argue that any breach of contract claim Yearout asserts against them arising out of the Project is barred by Yearout's failure to perform. Doc. 83-1 at 1. They argue that Yearout was obligated under the subcontract to install catwalks for the maintenance of the MAUs;[3] that Yearout failed to do so; that this failure constituted a material breach; and that because Yearout materially breached the contract, Yearout is "preclude[d] . . . from bringing any claims on the contract." *Id.* It is undisputed that Yearout did not install the catwalks. Docs. 83-2 ¶ 35; 96 at 13-14.

Movants GSC and Allied World have not carried their burden for two reasons, each independently sufficient to preclude summary judgment. First, the contract contains an ambiguity which cannot be resolved except by extrinsic evidence, which in

---

[3] GSC and Allied World describe their assertion the subcontract required a catwalk as "undisputed." Doc. 83-1 at 2. That description is misleading. *See, e.g.*, Doc. 96-1 ¶ 25 ("Yearout disputes Allied SMF ¶ 25 on several grounds.").

this case requires a jury. Second, even if Yearout did breach the contract, GSC and Allied World have not proved that breach was material.

*1. Whether Yearout breached the subcontract*

A question of fact remains on whether installing catwalks was within Yearout's scope of work—that is, whether Yearout had a contractual duty to install the catwalks. In interpreting contracts under Georgia law,[4] a court should "take the contract by its four corners, and determine its meaning from its language, and, having ascertained from the arrangement of its words what its meaning is, [should] construe it accordingly. Further, if the language of a contract is clear and unambiguous, the terms of the agreement are controlling and [a] court should look no further to determine the intention of the parties." *Lager's, LLC v. Palace Laundry, Inc.*, 247 Ga. App. 260, 261, 543 S.E.2d 773, 775 (2000) (alteration marks, internal quotation marks, and citations omitted). Additionally, "[i]n written contracts containing a merger clause, prior or contemporaneous representations that contradict the written contract cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties." *First Data POS, Inc. v. Willis*, 273 Ga. 792, 794–95, 546 S.E.2d 781, 784 (2001).

> The contractual provisions at issue here state, in relevant part,
>
> Subcontractor agrees to provide all labor, materials, supervision, equipment, tools and accessories for complete mechanical and plumbing work in accordance with the RPP, to include, but not limited to, installation of 2 Centrifugal exhaust fans, all interior hangar demolition, installation of new filter wall modifications, for first and second floor systems, replace bearings and sheaves for all remaining existing exhaust fans and laser alignment. Subcontractor agrees that all work is to be completed in accordance with the RFP, Specifications and Drawings, to include, but not

---

[4] The parties treat this motion as one governed by Georgia law, and the Court agrees that it is governed by Georgia law. *See U.S. for Use of Endicott Enterprises Inc. v. Star Brite Const. Co.*, 848 F. Supp. 1161, 1168 (D. Del. 1994) ("In actions brought under the Miller Act, issues not involving the construction of the Act, such as ordinary contract issues, will be resolved by the law of the state where the contract is performed.") (citations omitted).

> limited to, all applicable codes and Robins AFB Guidelines. Subcontractor agrees and understands that this is a design build contract and will take participation in the design and review of the mechanical and plumbing design. There will be no modifications to the contract without a modification to the scope of work of the original RFP. Subcontractor understands and agrees that this fs a base bid award and that an additional option to include remaining mechanical/plumbing work in contract may be forthcoming. Once option is awarded to GSC Construction, as part of this contract, Yearout agrees to accept option at a cost increase of $3,436,009 to complete turnkey mechanical and plumbing system.. Subcontractor understands and agrees that GSC has been working with Trane Corp. and has negotiated a price in the amount of $1,645,000 for Trane to supply stacked internally supported MAU's and humidifiers equipment for said project. Subcontractor agrees and understands that all guidelines and estimates of original contract will be made a part of the award with the acceptance of original contract between GSC Construction and Yearout Mechanical, DDC will be completed by others.

Doc. 20-1 at 12. Catwalks are not mentioned. *Id.* Yearout is clearly responsible for "complete mechanical and plumbing work in accordance with the RFP." *Id.* The question is whether catwalks fall within that scope of work.

The parties differ on how the RFP should be interpreted. GSC and Allied World maintain the catwalks were part of Yearout's scope of work, pointing to design requirements in the RFP under the section heading of "Mechanical Design." Docs. 83-1 at 9; 88 at 125. Within that section, a subsection entitled "E. Space Allocation for Maintainability and Functionality" states the following: ". . . 4) Position equipment so that required ladders to reach devices have a clear location on the floor for placement. If space is insufficient to safely use a step ladder, provide a vertical ladder and catwalk to provide access." Docs. 83-1 at 9; 88 at 126. According to the movants, that reference to catwalks in the mechanical design section implies that catwalks were within the mechanical scope of work, which was Yearout's scope of work. Doc. 83-1 at 9.

Yearout argues that the catwalks were within the structural steel scope of work. Doc. 96-1 at 14. It points to the "Structural Design" section of the RFP, which states the

-7-

following: "A. Provide galvanized structural steel platform for upper MAUs."  Doc. 88 at 124.  That section also requires the platform to "have a minimum of 60[in.] access on the coil pull and 40[in.] outside air intake sides," presumably for maintenance.  *Id.*  Yearout claims the "'access' referred to in this section is the elevated walkway or 'catwalks.'"  Doc. 96 at 6.  Yearout points to evidence to show that "galvanized steel platforms," as used here, include catwalks.[5]  Docs. 96-1 at 15.  GSC's project manager, Will Dozier, thought the MAU platforms included catwalks:

> Q: ". . . . One of the other items excluded on here [a bid for a subcontract by Bramlett, before Yearout got the subcontract] is the elevated galvanized platforms with grading for MAU units.  What was that?
>
> A: Those were the MAU supports and catwalks.

Docs. 90 at 97:6-10, 12:19-24; 96-1 at 14 n.3.  Also, Curtis Williamson, a project manager for JLA, the engineering company on the Project, testified that the platform in the RFP included an area around the MAU for someone to walk on:

> Q. I just want to make sure that I understand. The original plan was concrete piers for the bottom unit, then a steel platform, and then the top unit was going to sit on the steel platform. That steel platform had its own catwalk, its own area outside of the MAU for someone to walk on; correct?
>
> A. Yes.

Doc. 87 at 7:15-25, 11:24-12:2, 166:2-9, 164:20-23.  There is, therefore, evidence that the platforms required under the structural design section included a catwalk.

---

[5] Evidence of the meaning of "galvanized structural steel platform" is permitted under Georgia law.  *See Southland Dev. Corp. v. Battle*, 272 Ga. App. 211, 214, 612 S.E.2d 12, 15 (2005) ("One rule of construction provides that '[w]ords generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning.' 'Ambiguities in terms used in written contracts, and their meanings as understood in the trade and by the contracting parties, may be explained by parol proof of this trade usage and custom. Parol evidence is admissible to explain the meaning of technical terms employed in written contracts.'").

-8-

Under Yearout's interpretation of the RFP, therefore, the requirement to provide catwalks is in the structural design section of the RFP, and the catwalk is mentioned in the mechanical design section only to guide the designer on how to position the MAUs and allocate space.  *See* Doc. 96 at 5.[6]  Under that construction, which is a reasonable one, it is unclear whether catwalks are in the mechanical design or structural design section of the RFP.  The Court, therefore, must reject GSC and Allied World's contention that the contract, by its reference to the RFP, unambiguously assigns catwalks to Yearout.  *See* Docs. 83-1 at 2; 104 at 2, 4-8.

"'Construction of ambiguous contracts is the duty of the court, and it is only after application thereto of the pertinent rules of construction, and they remain ambiguous, that extrinsic evidence is admissible to explain the ambiguity.'"  *Holcomb v. Word*, 239 Ga. 847, 847–48, 238 S.E.2d 915, 916 (1977).  Rules of construction do not resolve this ambiguity.  Neither party, in its briefing, points to pertinent rules of construction for resolving contractual ambiguities.  However, Georgia statutes provide some useful rules. First, in Georgia "[t]he cardinal rule of construction is to ascertain the intention of the parties." O.C.G.A. § 13-2-3.  That intention is not clear from the RFP.  Georgia law also provides that "[p]arol evidence is not admissible to vary a written contract, but ambiguities in the written contract "may be explained."  O.C.G.A. § 13-2-2(1).[7]  Neither

---

[6] The Court focuses here on the RFP because it is directly referenced by the subcontract.  Doc. 20-1 at 12.  However, Yearout also argues the RFP is not the only evidence of its intended scope of work under the contract.  For instance, the catwalks were included in the structural drawings for the Project, which Yearout claims is evidence they are in the structural steel scope of work.  Doc. 96 at 5 (citing Docs. 96-2 at 3, 10).  Thus according to Yearout, the RFP is just one document among several evidencing what the subcontractor agreement (Doc. 20-1) means by "mechanical and plumbing system."

[7] GSC and Allied World's argument that this is a fully integrated contract, so parol evidence cannot be used to contradict the written contract, is well taken.  Doc. 83-1 at 11 n.3.  But "in interpreting contracts, [a]ll the attendant and surrounding circumstances may be proved and, if there is an ambiguity, latent or patent, it may be explained[.]" *Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 639, 786 S.E.2d 250, 253 (2016), *reconsideration dismissed* (2016) (alterations in original) (citing O.C.G.A. § 13-2-2(1)) (quotation marks and citations omitted).

do any of the other rules of construction in § 13-2-2 resolve the question. Because there is a possible contradiction in the RFP between the structural design section, which suggests catwalks may fall within the structural scope of work, and the mechanical section, which suggests catwalks fall within the mechanical scope of work, there remains an ambiguity.

There is, however, extrinsic evidence that the parties considered catwalks to be outside of Yearout's scope of work. In an email dated June 26, 2015, Dozier indicated that he thought drawings for the catwalk were not in Yearout's scope of work. Doc. 90 at 123. Yearout has also adduced evidence that it never refused to provide catwalks because it did not receive notice until January 19, 2017 that GSC had expected Yearout to provide catwalks and that GSC believed Yearout had failed to do so.[8] Doc. 96-4 at 5-6. As of June 2015, the design of the catwalks was still incomplete. Doc. 94 at 111:18-112:20. Yearout was not included in certain discussions affecting the catwalk design. *Id.* There is also evidence that as early as June 30, 2015, GSC had bid out catwalks to another subcontractor without giving Yearout notice or an opportunity to cure. *See* Docs. 91 at 36:5-37:18 (noting bid from Steel Fab was received on June 30, 2015), 57 (showing revised bid by Steel Fab on July 13, 2015 for $359,468); 96-4 ¶ 13, 12 (showing GSC later backcharged Yearout $359,468 for others' work on catwalk).[9]

---

[8] GSC claims Yearout did receive such notice, as well as a backcharge, around the time GSC entered into a contract with CDM for the work on the catwalks, which would have been before January 19, 2017. Doc. 88 at 138:23-140:3.

[9] At his deposition, McKnight suggested that removing catwalks from Yearout's scope of work and giving them to CDM "ended up being the solution that was ultimately agreed to by all," which, if true, would undermine GSC and Allied World's claim that Yearout's failure to provide the catwalks was a material breach which bars Yearout from recovering against GSC or Allied World. Doc. 88 at 133:23-134:19. At this stage, the Court views the evidence in the light most favorable to Yearout, the non-moving party.

On the other hand, George McKnight, owner of GSC, testified that a complete or "turnkey" mechanical system would have included catwalks.[10] Doc. 88 at 119:8-120:23. This conflict between two permissible interpretations of the contract, each supported by different extrinsic evidence, is not for the Court to resolve. "[I]f the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury." *Envision Printing, LLC v. Evans*, 336 Ga. App. 635, 638, 786 S.E.2d 250, 252 (2016), *reconsideration dismissed* (Apr. 6, 2016); *see also Restatement (Second) of Contracts* § 212 (1981) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence."). Viewing the facts in the light most favorable to Yearout and drawing "all justifiable inferences" in its favor, the Court cannot conclude that the contract required Yearout to install catwalks. *Anderson*, 477 U.S. at 255.

### 2. Material Breach

Even if there were not a factual issue on whether the catwalks were in Yearout's scope of work, GSC and Allied World have not carried their burden of showing that the alleged breach was sufficiently material to completely relieve GSC of its contractual obligations. "A breach which is incidental and subordinate to the main purpose of the contract, and which may be compensated in damages, does not warrant a rescission . . . or termination nor does a mere breach of contract not so substantial and fundamental

---

[10] GSC and Allied World also argue the phrase "turn key" unambiguously requires completion of all aspects of the mechanical system. *See, e.g.*, Doc. 104 at 8. That does not, however, dispose of the underlying question of what constitutes a mechanical system in the first place. Just because a structural component is necessary for the functioning of a mechanical system does not mean it is part of that system. *See* Doc. 87 at 168:13-20 (stating the raised steel platform for the MAU from the original design "supports" the mechanical system but is not a part of it).

-11-

as to defeat the object of the parties in making the agreement." *Mayor & City of Douglasville v. Hildebrand*, 175 Ga. App. 434, 436, 333 S.E.2d 674, 676 (1985) (alteration in original) (quotation marks and citation omitted). Whether a breach is material may depend on several factors: the extent to which the injured party was deprived of the benefit of its bargain, the extent of performance by the breaching party, whether the breaching party can cure its failure, and whether the breaching party acted in good faith, among others. *See Restatement (Second) of Contracts* § 241 (1981). "The determination whether a material breach has occurred is generally a question of fact." 23 Williston on Contracts § 63:3 (4th ed.). "As such, the issue of materiality is 'especially unsuited to resolution by summary judgment.'" *Toler v. Engelhard Corp*, 2006 WL 1133040, at *3 (M.D. Ga. 2006) (quoting *Sahadi v. Cont'l Ill. Nat'l Bank*, 706 F.2d 193, 196 (7th Cir.1983)). Because materiality is a question of fact, GSC and Allied World must show that no reasonable jury could conclude the breach was not material.

The movants have failed to carry that burden. They argue the object of the contract was "install a HVAC system with catwalks so the Army would accept the work." Doc. 83-1 at 11. However, catwalks were one item among many in the contract, and neither GSC nor Allied World claim that the lack of catwalks deprived them of the benefit of their bargain as a whole or defeated the main object of their contract. Doc. 20-1 at 12. In fact, there is evidence GSC found it acceptable to retain Yearout even without Yearout's providing catwalks, and that it even agreed to an arrangement whereby a different subcontractor would do catwalks. *See* Doc. 88 at 133:23-134:19. Additionally, as Yearout points out in its response, there is evidence that the catwalks "were a separate and divisible portion of work that was provided by the steel subcontractor for $359,468—less than 10% of the original Yearout subcontract price."

Docs. 96 at 17; 96-3 at 78; 91 at 57. Although materiality is not a quantitative determination, those numbers are some evidence that GSC largely received the benefit of its bargain with Yearout, whether that bargain included catwalks or not. Viewing the facts in the light most favorable to Yearout, any alleged breach of an obligation to install catwalks was not material.

## III. CONCLUSION

For the reasons discussed above, Defendant GSC and Defendant Allied World's joint motion for summary judgment (Doc. 83) on Defendant Yearout's claims against GSC and Allied World for GSC's breach of contract is **DENIED**.

**SO ORDERED**, this 13th day of December, 2018.

S/ Marc T. Treadwell<br>
MARC T. TREADWELL, JUDGE<br>
UNITED STATES DISTRICT COURT